Mr. Paul, you may proceed. May it please the Court, my name is Norman Pauley, I represent Dr. William H. Durham, also known as Rusty Durham. This is a complicated case that's before the Court, and my first time to appear before Your Honors in an oral argument, so I embrace this opportunity to represent Dr. Durham, seeking a remedy to have this case tried before a jury, a fact finder. We didn't get that opportunity in this case. I've known the trial judge for a long time, and I was quite taken back by his rulings, both in his inability to glean that Dr. Durham had detrimentally relied, and by shutting his business down, as he had to do ethically. He gets a letter telling him that the trust would no longer accept his reports. He had been providing these services, asbestos claims medical-related services, that's B-reading of chest x-rays, that's performing physical exams of injured workers that had been exposed with a long history of asbestos dust, writing link letters for cancer, once these claimants that were already in the system are subsequently diagnosed with an invasive procedure of some type of a lung biopsy, and there's a forensic pathologist that reports on certain cancers. You know, Dr. Durham is an intelligent man. He became board-certified in internal medicine right up the river from here at Alton Oshner Foundation Hospital on Jefferson Highway, did his residency there. Then he had an internal medicine practice, a large practice in Macomb, then he moved over to Hattiesburg, Mississippi, and became one of the best ER physicians. He would run to the task to help people when other doctors and nurses would look to him to take the lead. He's an ambitious young man who's not young anymore, but he was an ambitious young man, and in 2008, he was performing the medical examinations for lawyers that had these claimants that other B-readers had already found positive findings consistent with asbestos dust in the lungs at low perfusion levels. Do you have any evidence of malice that is inconsistent with the stated goal of identifying inaccurate reports? You have to have some evidence of malice, do you agree that you have to have some evidence of malice to win, to get to summary judgment? Yes, Your Honor. To overcome. So what is the evidence of malice that is something different than just identify, you would say, is a good thing, don't you think? So what evidence of malice? I'm unclear with Your Honor's, Judge Elrod's, your term of identifying . . . Inaccurate reports. Inaccurate. That's what they're doing. They're saying these are not accurate. Oh, okay. I understand now. So what evidence of malice is there in this record? Your Honor, the evidence of malice is that the audits that they were doing on Dr. Durham, they had intentionally targeted him because he was high volume. How do I know that they know he was high volume? It's because we have an email at 5852. It's a very small print at the bottom, but it identifies 6,916 claimants that in one way or the other were relying upon Dr. Durham's reports. Well, so, but why isn't that legitimate to audit someone who's so high volume to make sure that they're doing a thorough job? It is, Your Honor. And we don't dispute the fact that they had a right to audit him. They just had to do it in an honest way. They had to . . . What is the malice? The malice is they didn't just use 44 x-rays that just happened to be around. As Dr. . . . as Gary Wingo said, that the district judge grabbed a hold on and disregarded our evidence that these were cherry-picked 44. Keep in mind, those 44 were reused x-rays. They had successfully used those same 44 in the audit of 98 when they failed him. So, if they wanted to do a coup de grace audit, they would use those same and put it in . . . So, it was a fake audit. It was a sham audit because they cherry-picked ones that they had Dr. Pierce pre-screened and they successfully failed him in the 98. So, then they took 31 of Dr. Pierce's fails and they put them in the 44 so that it would be heavily weighed. Or, as the trial judge acknowledged to me in the hearing, he said, putting the thumb on the scale. That's what they did. And so, it even gets worse. There are six lung zones, three on each side. The lowest lung zone is if you only have opacities, just a few opacities in the lower lung zone instead of in combination with opacities in the middle lung zones, it's harder to see unless you are NIOSH certified. And the problem we had with this malice is because this audit team, they put together their judges. They grabbed the low perfusion x-rays, 22 of the 31 or 22 of the 44 were isolated lower lung zones only. And to do that, there's only one reason. In order to create a situation where Dr. Durham would more likely fail their final audit. And that's the malice. And we proved that to the district judge. What is your best evidence or your evidence at all that Ankara benefited financially by disqualifying doctors? That's a very good question. I'm glad you asked it. The average payout on a 1 slash 0 claim is about $40,000. If you have 6,916 claimants, for easy math, I'll round it up to 7,000. 7,000 times $40,000 is $140 million. Now what that means is that these people already approved. They were waiting on disbursements. They suspended, and this is outrageous, they suspended all of these claimants waiting to do the Coup de Grace audit on Dr. Durham. They would save this money. Now what is Ankara going to do after that? They're going to do claims forecasting. They're going to do financial advice. If you look at the first page of their agreement, Your Honor, it identifies about six of the functions. It's in paragraph one of that agreement. There's nine agreements, one with each trust. They self-perpetuated services that for years they would be able to make money off of this. And they also know from an actuarial standpoint that a lot of these claimants were not going to get subsequent B-reads. I checked yesterday. There's only 189 B-readers in the nation right now. There are fewer and fewer. You point to specific evidence that supports your assertion that it was, and I'm quoting, it was a certainty that the trust would accept Ankara's recommendation. I could point to proximate cause includes a component of cause and fact and foreseeability. And what we showed was, when you look at that same contract that I mentioned, Judge, it appointed John Brophy as the assistant executive director of the trust, and Tom Florence, also an Ankara employee, both of these are Ankara employees, and on the audit team as the executive director. These people had high influence. They had been working in a good relationship with the trustees. I put into evidence the minutes of the trust's meeting in the second quarter of June 2018 when they readily accepted John Brophy's recommendation. That relationship, those past years, Your Honor, of John Brophy making recommendations to these trustees is a pattern which I believe raised a jury issue of contested facts as to whether or not it was foreseeable. And, Your Honor, Judge, the trial judge agreed with me. We were in the oral argument, and if Your Honors would look at the transcript, pages 4826 through 4820, you will find two very significant things. The judge admitted that it was a jury question and that it was foreseeable, that that was a very good question that would be foreseeable for the jury to resolve as to whether or not the audit committee and the trustees would accept the recommendation of John Brophy and Tom Florence, who sit on the audit committee. It was interesting. You know, the judge is supposed to infer the evidence in the light most favorable to the nonmoving party on a summary judgment standard. And there's a footnote in his order where he said there were only six audit team members from ANCORA on the committee, six out of fourteen. Well, if you want to infer for the defendant, the moving party, you say, oh, that's less than half. But if you want to do the inference in the light most favorable to the nonmoving party, you would say, wow, that's 43 percent representation on the audit committee with strong heavy hitters like Tom Florence and John Brophy. That inference should have gone in favor of Dr. Durham in this complicated case. This is all nice theory, but I'm not hearing evidence. I mean, ANCORA made these audits, right? They made recommendations to the trust audit committee, correct? Yes. That audit committee then made recommendations to the Board of Trustees. No, sir. So who was the decider here, and how did ANCORA cause them to decide? These audit team members for ANCORA sit on the audit committee. I get that. They get the green light. But the audit committee is a different organization than ANCORA. They don't have to take ANCORA's recommendations. No, but they did. Well, they did. They did. But there's no evidence that they would, by definition, take it. I mean, you've got to show causation. No, they did. John Brophy would not have gotten on the agenda for the quarterly meeting with the trustees if he didn't get the green light, yes, you may go and present it. So we know he got 100 percent certainty. John Brophy got the approval of the audit committee to be put on the agenda and make his recommendation to the trustees. That's an absolute certainty. Yes, but back to Judge Wiener's question. We're trying to figure out causation here, causation of any injury. ANCORA was not the ultimate decider. Should we deny Dr. Durham? Should we decline to use Dr. Durham anymore or any reports from him? They didn't decide that. So how do you have a claim against them when some other entity, the trust, decided it? They were the professionals that did this audit, which we say was a sham audit. And then they were in the position, but for their recommendation and asking permission from the audit committee to present it to the trustees, but for them doing that, no letters would have gone out. So the causal connection, proximate cause. But for the audit committee agreeing and concurring, the letters wouldn't have gone out. But for the trust approving the audit committee's recommendation, the letters wouldn't have gone out. I agree, Your Honor. How many layers of causation can we go before your claim breaks? It's very small. It's very short. They sit on this audit committee. Six members do, six of them. But do you have evidence that they controlled the committee? I mean, you're basically arguing that the committee didn't do its job. It was a rubber stamp for ANCORA. Where's the evidence of that? The trustees were a rubber stamp of the recommendation by ANCORA's John Brophy. Where's the evidence of that? They directed that the letters get sent out. It was, if you look at the minutes, they had many things on their agenda that day. This was only one of the things. It was held in, it was accomplished in short fashion. They readily accepted John Brophy's recommendation because who John Brophy is and how many years he's been appearing in front of them making recommendations. Like when E.F. Hutton speaks, they listen to him. The fact that he was there, he got the approval, the letters went out, and as Judge Sterritt noted in those pages that I mentioned to the court a few minutes ago in the transcript, that it was also foreseeable how quickly Judge, Dr. Durham's business was shut down. And that that also is a jury issue to go to causation for the amount of damages that we pled. Speaking of pleading, the judge found that I had deficiently alleged reliance by the doctor. He found that I had sufficiently alleged reliance by the law firms but not by the doctor. So I would ask the court to look closely at paragraph 44 of the amended complaint, and it's at ROA 136. And what's significant about that is I used the word them on the last line of the paragraph, T-H-E-M, and then but for interference of his said contract by incur. So in this paragraph, I'm saying that Dr. Durham was providing the services to the law firms, and they were compensating him. And but for them would. . . Mr. Pauly, your red light is on, and that means that your initial time of speaking is over. Okay. And so you have, say, five minutes for rebuttal. Yes, ma'am. And you can have that rebuttal time after your friend on the other side speaks. Okay? Thank you. Thank you. We have two people speaking. What's. . . Are you all both representing the same entity? What's happening?  Yes, Your Honor. My name is Ben Thomas. On behalf of Appalee-Anchora Consulting Group, LLC, my co-counsel, Ben King, will be arguing demerits issues. I'm focused on the subject matter jurisdiction issues and Barton Doctrine. I'll be happy to answer any questions after my eight minutes. So I'd like to address two points. We talked about either of the two things you're supposed to be talking about. I'm sorry, Your Honor? I don't think we talked about with your friend on the other side either of the two things that you're addressing. I'm sorry. I'm going to address causation evidence first. Okay. And then I'd like to discuss related to jurisdiction as it regards Barton. I thought we were just talking about it. Okay. Go ahead. Yeah. Thank you, Your Honor. So in circumstances like this, the plaintiff must show that third parties will likely react in predictable ways. I don't think there is any evidence that John Brophy's presence at a meeting on June 12, 2018, had that effect on the trustees who have. . . There are three of them. They have independent fiduciary obligations created by the bankruptcy court and the trust agreements. They're governed by the TDPs. They're under continual supervision. They make annual reports to those courts. To relate to this problem, Dr. Dorham contends it was a certainty. There are two problems with this. There's no evidence of it. If you look at 5509 in the record, which are the minutes he was discussing, it's relevant to my argument. They weren't put in until a month after the final judgment, so I don't think they should be relevant on the merits. But they, in record . . . Well, what did they say? Did they say that it's a rubber stamp like counsel . . . Well, so they're legal minutes taken by Secretary Marla Eskin and trustees counsel. They say that John Brophy is present, that Marla Eskin is present, that they present some information about a medical audit. And when Mr. Polley or my friends on the other side tried to elicit testimony that it was . . . that was a final decision, that it was Mr. Brophy who had spoken, they don't have that testimony. It's at 4437-38. They don't even have testimony that's the final decision. So, in late June, after this letter went out from trustees counsel, Dr. Durham himself started calling the law firms. That's record 235, 509, 726, before a final decision had even been reached. So, I don't think that there's any evidence in the record to show that it was a near certainty or a high probability that the trustees would just . . . This rationale is also in conflict with the Court's decisions. So, in inclusive communities, the Court refused to assume that the Texas Department of Housing and Community Affairs would abandon the discretion given it by law. Same thing last . . . two years ago in Davies v. Dallas County, this Court refused to assume that state magistrate judges would abandon the discretion given them by their supervising district court judges. As Judge Sterritt pointed out below, judges don't abandon their discretion to their law clerks, even when they're good. That's record 3078. Those are all governmental entities though. It's true, although like a court, these trustees have fiduciary obligations created by a court. In all these kinds of cases, there is some measure of coercion. And, it's hard to see some here. Was there some . . . one of these people who said something that was inflammatory that you need to deal with or not? I'm sorry. No? None of . . . one of these people didn't criticize him in an untoward manner? One of the trust members? No? I don't know, Your Honor. I'm sorry. Okay. This is the record. That's good. Okay. Thank you. I don't think that this court has an obligation to hunt for truffles in this record. They haven't cited evidence showing that they meet the standard required under inclusive communities under Davies v. Dallas County. The related to jurisdiction issue, it's . . . we don't have all of the bankruptcy plans in the record. We did cite one at page 7 of our brief. That's the WR Grace plan. And, it's clear from these documents of which the court can take judicial notice. For instance, section 3-1-6, the TDPs are part of the plan. The TDPs are what authorize ANCRA to conduct these audits. It's through these audits that they discover the wrongdoing of Mr. Durham . . . Dr. Durham, rather. So, this case isn't really like Henry Craig's, which he cites in his response. It's really more like Henry U.S. Brass, which is a post-confirmation jurisdiction case where the court retained jurisdiction . . . or had jurisdiction, rather, to hear the case. It's not Henry Craig's. It's not like Henry Craig's. It's like Henry U.S. Brass. Also, on page 31, I think it's important the court can take judicial notice of the trust agreement. And, that trust agreement does authorize the trust to retain professionals, like counsel, like ANCRA. That makes this a lot like Ariel Preferred Retail Group, which they seek to distinguish on page 12 of their reply brief, but they fail to do it. Can you talk about Lawrence v. Goldberg? You want to talk about it? Um, sure. That's a court case in the Eleventh Circuit. Right. I mean, I . . . All of these cases are Barton cases. The Barton Doctrine has been recognized in this circuit, in the Seventh Circuit, the Eighth Circuit, and the Ninth Circuit. It relies on the interim jurisdiction of the bankruptcy court that enters an order, retains jurisdiction, governs these guys. Most of these, it originates in Barton v. Barber with receivers. A lot of the current cases are out of bankruptcy trustees, but the rationale is the same. That bankruptcy trustees, as adjuncts of the court, can't do their job if they're being targeted for lawsuits. Same if a court has a given permission for a receiver to hire counsel, hire consultants. They can't do their job if they're facing suits when operating under the jurisdiction of the court. Thank you. Well, Mr. King is up. Yes, thank you so much. Thank you, Your Honors. My name is Ben King. I represent the appellee in Curran, and I'm here to talk about some of the merits arguments, including some of the ones that were discussed previously with counsel for Dr. Durham. On the negligence issue that counsel began with, the simple truth is that in his original pleading and his First Amendment pleading, he did not say anything about reliance. He did not allege that he believed the results of the Ankara audit, or he believed what was said in the letters to the law firms refusing to take Dr. Durham's evidence anymore. And he never said that he thought that was true and that he acted in response to the truth of that. He submitted an affidavit in support of his opposition briefing to the motion to dismiss the First Amendment complaint, and he tried to convince the district court to look at that affidavit. But the district court refused to because, naturally, it's outside the record, and the district court exercised its discretion and determined not to look at that document. But even if he had, it would not have mattered because he doesn't allege any reliance in the affidavit either. He just says what he did in response to the letters that were sent by the trust. He doesn't say that he believed the letters from the trust were true or that he thought that Ankara did a good job. Was it predetermined that the audit would come out like it did? Is there certainly evidence in the record? If they already knew that these were bad, they cherry-picked bad ones. So the evidence in the record is that one doctor, Dr. Pierce, reviewed 98 of his randomly selected. Let me back up for a second. So there's been a series of audits that build. The last kind of attempt to work with Dr. Durham was the tracing study, which is kind of like the opportunity for Dr. Durham to explain himself and say why his opinions were so much different from all the other doctors that reviewed his x-ray reads. And really most of the beef that he has with the work that Ankara does relates to the tracing study and not to the prior audits. So the first audit was the specialized law firm audit in which Dr. Pierce, who is a pulmonologist and has been used by Ankara in multiple audits. He wasn't specially chosen for this audit, so Ankara did not go out to find a ringer to sink Dr. Durham. They used the pulmonologist they always used to do the audits, and he looked at the submissions for this one law firm. Many of them used Dr. Durham's x-ray reads, and he found that 19.8 percent of those x-ray reads were major fails. Have any of the courts extended the Barton Doctrine to third-party auditors who are not appointed by the bankruptcy court? I don't believe that that specific thing has happened. Our position on the Barton Doctrine is that the purpose of the Barton Doctrine is to protect the trustees so that they can do the work that has been assigned them by the bankruptcy courts. The Barton Doctrine has been used to protect other agents that have been appointed to help the trustee, and there's one case that I can't call the name of out of California in which it was also used to protect the agents of liquidating trustees. It hasn't been extended as far as I know to a claims auditor like Ankura, but the principles behind the Barton Doctrine would apply there as well. So did Dr. Pierce not know that this whole pool was a bad pool? So the pool when Dr. Pierce first looked at him had not been pre-screened. He was the first of our reviewers to look at the x-ray reads. He did this for the specialized law firm audit, found that 19.8% of them were major fails, a major fail meaning that no physician could possibly believe that it was plausible that there was a disease in this lung. There's grades of 1, 2, 3, 4. There's 4. Total fail. All right. So then based on that 19.8%, they did not terminate Dr. Durham at that point. What they did is with the authority and direction of the trustees, they decided to initiate a specialized audit of Dr. Durham. All right. And then they got 100 claims for Dr. Durham. The trustees decided that. Yes. Trustees decided that. They got 100 claims, randomly selected claims. Did the trustees set the parameters of the audit or did Ankura do that? I don't know. I'm sure that Ankura at least advised as to what would be the parameters of the audit, what exactly the trustees' involvement was in specifications. I'm not sure. I do know that Ankura followed the guidelines, the directions in the claims audit procedures manual that had been approved by the trust. One of the key things there is the audit procedures manual requires Ankura to use a pulmonologist to do the reviews of, to do the audits of the x-rays. Okay. Could they have terminated at that point? Absolutely. When the level four fails came in. Absolutely. Could they terminate at any time? At any time. Without even an audit at all? Without even an audit at all. Yes. And, you know, this is kind of the overarching theme is Dr. – the trust did not owe any duty to Dr. Durham. I mean, the trust don't want to be mean. Ankura doesn't have any ill will towards Dr. Durham. They want to do business with. Correct. You know, for whatever reason. Right. As long as it's not illegal business. Now, in fairness, the trust and, therefore, Ankura do have some responsibility to the beneficiaries of the trust, the people who filed the claims and are properly beneficiaries. And there's some language in the trust agreements that require the trust to accept claims that are reasonable and exclude evidence in their reasonable judgment. So there is some sort of parameter on that. But that's not a duty that's owed to Dr. Durham. Right? Dr. Durham is not a beneficiary of the trust. Did Ankura or the trust get sued by all these people that had had him read their things and didn't get the money? I don't think so. That's not in the record, and I don't believe that they did. Now, in this process of looking at many of the doctors, they also terminated two others, Dr. Klepper and Dr. I can't remember the other guy's name. But they had a lawsuit in California in which they alleged exactly the same thing as Dr. Durham in that they were subject to unfair audits. And they lost litigation immunity, litigation privilege. But it was the exact same thing. So back to the audits. After the 19.8% major failure rate that was found in the law firm audit, they initiated a specialized audit of Dr. Durham, which Dr. Pierce reviewed 100. I'm sorry. They intended to review 100. They couldn't get two of them that had been randomly selected. So he reviewed 98. He found out of that, I believe it was 48.6% of the x-rays that they reviewed indicated that there was implausible, that these lungs were diseased. And so at this point, clearly, under any stretch of the imagination, the trust and NCURM and the audit committee could recommend or decide. That includes, that's randomly selected? That's not the 48 or the certain amount cherry-picked yet? We're not to that part yet. We're not to that part yet, yes. Those aren't the cherry-picked ones. The allegedly cherry-picked. None of them were cherry-picked. Okay. So after the decision had been made that, you know, 48.6, that's a whole lot of major errors. We should probably do something. They decided to give Dr. Durham, somewhat at his request, a last chance to explain himself to see why these major error rates were so high. And let me pause for a second. It's not in the trust's interest in any way to ban a doctor, right? The trust exists to equitably deal out its assets, the corpus of the trust, to proper beneficiaries. There's no benefit at all to NCURA or to the trust to get rid of a doctor. In fact, I mean, look at all. Well, if it's a doctor, then. Right. So we'll get to malice in just a second. But I better get to it now, actually. One of the cases I would like to draw the court's attention to most in this case is called Springer v. Allspern Construction. This is a case that is in our materials. It's 231 South 1065, and it's been affirmed by the Mississippi Supreme Court on the issue that I need to talk about, which is the definition of malice. So in this case, there was an engineer for the county who made a recommendation, who sent out specifications for a project to build a road. But his specs were completely off. He thought that it would require far less material than it actually did. So Allspern, the construction company, bid based on this amount that was in the specs. They built the road. It turns out they needed way more materials, and they went to the state department of the state aid office for approval to get paid for the full amount of materials they used. The state aid office says, yes, you should get paid for the full amount of materials you used, and you should get paid at the full contract price. So then they go to the county, and they go to this guy whose name was Springer. Springer was the engineer. And they say, Mr. Springer, now we need to get paid. Springer said, well, why don't you take less? Why don't you not take $19.50? Why don't you take $8 a cubic yard? Allspern got mad, and they sued Springer. And they sued him for tortious interference with contract and prospective business relations, just like Dr. Durham did here. And they had a jury verdict, a large jury verdict, in Allspern's favor. But on appeal, the Mississippi Court of Appeals reversed, because they said there is no evidence of a bad faith motive. So in this sort of situation where you have a representative of a company or a government entity whose kind of responsibility it is to interfere, as the engineer for the county, he's responsible for making sure the county doesn't pay out more than it should. Just like ANCURA is somewhat responsible for making sure that the trust doesn't pay out more than it should and pay out to the wrong people. This is naturally going to lead to conflict between claimants and doctors and lawyers, and that's what happened here. I think that if ANCURA had done a fantastic, I mean, just the best possible, and I'm not saying they didn't, but the best possible audit anyone could possibly imagine, we'd still be here, he'd still be mad because he got blackballed. All right, so the... For a discriminatory reason, would that be a different scenario? Like if they were racially discriminatory or something? Exactly. That's the sort of thing that would be a bad faith motive. Suppose there was a mystery Dr. Jackson. There's no Dr. Jackson, but pretend there's Dr. Jackson who paid off ANCURA to get rid of Dr. Durham so that the trust would take more reads from Dr. Jackson. Okay, that would be a bad faith motive. Here there's no bad faith motive at all. Would funneling all these to your brother-in-law be a bad faith motive? That would be a bad faith motive. So it's not just legal discrimination. Right, and you think that requirement of a bad faith motive is necessary here because ANCURA is going to be constantly faced with this sort of situation because they are in the position of interfering with other people's business. So they're going to have to face these claims. And malice is what protects them, just like malice is what protects County Engineer Springer. Back to the cherry-picked real quick. They were not cherry-picked. They were the x-rays that ANCURA had on hand to use in this tracing study, which is like the last best chance. It didn't have anything to do with the audit. It was a check, and there was no cherry-picking. They complained that most of the x-rays in the sample were low perfusion. I'm confused about something, though. Yes, Judge. I'm not sure this is really a standing problem. It's just a causation problem because you could imagine that it would be a third-party stand, even under Murthy, although I'm not the greatest judge on standing, obviously. But is it really standing, or is it just lack of evidence of causation? Either way, I think we win. Obviously the judge below found that we won on kind of regular old standing. But for the constitutional standing, I think the trick is that when the threat of causation runs through other decision-makers' minds, when you're trying to show that it was— Third parties. Right. See how it could go through the third parties. I'll admit that most of the cases are about these sort of government situations where someone is trying to influence the government. Actually, it's the other way. The government is trying to influence somebody to do something, and the courts have kind of given them special protection in that situation. But really the dynamics are the same. Here we have Ankura that did a job that was reported to the Audit Committee, which Ankura was on but did not control, and the Audit Committee made a report to the trustees, of which there were many. There were three on each of the nine trusts. There was some overlap between them, but they're pretty much unique individuals, three on each. That's a lot of people. There's no way Ankura controlled all those people. I think that you've answered my question, and your time is up. Thank you. Thank you, Your Honor. Mr. Polley, you've saved time for rebuttal. Thank you, Your Honor. Your Honor, you all asked about how is the audit supposed to be designed? Does the trust dictate that? And I'll try to help answer that question. There's a TDP for each of the nine trusts, and they're practically identical. But I want to bring the Court's attention to Sections 5.7 and Sections 5.8. In particular, Record on Appeal number 1271, where the TDP recognizes that the reliability of a doctor provider's evidence that's under review needs to be reviewed in a manner with recognized medical standards. So we've got a NIOSH-certified B-reader who rendered his opinions every time he filled out an ILO report on an individual claimant's chest X-ray. And then at page 1275 in those two sections I just informed the Court of, it says that the review, the reliability of the evidence must be, if they're going to say it's unreliable, that must have been reasonably determined. So we've got a duty for them to reasonably determine the reliability of Dr. Durham's opinions, which he rendered within protocols and standards of a NIOSH B-reader. If we're going to reasonably determine that, as the TDP says they're supposed to do, number one, they're supposed to use pulmonologists. Dr. Leviton was not a pulmonologist, so they violated one of their mandates on the get-go. Number two, they're supposed to use unbiased and neutral experts reviewing Dr. Durham with recognized medical standards as a NIOSH-certified B-reader. So we ask ourselves, was the other viewing doctor, Dr. Weil, was he currently NIOSH-certified? And the answer is no. He had failed the test in 2009. That means NIOSH in the recertification test. He previously was certified from 2005 to 2009, then he failed it. That means from 2009 forward, NIOSH had determined that he could not distinguish between a minimally positive lung at 1 slash 0 and one lower than that at 0 slash 1 or 0, 0. So he was not, he shouldn't have been on the board at all. And Dr. Pierce, the evidence is he never took the NIOSH certification test, but he had been a good old boy of John Brophy's and Tom Florence. He worked for them at ARPC, their former company, for 15 years, and they carried him with them. He was biased. He had a bias towards not finding evidence of low perfusions at 1 slash 0. And I'm going to state something else. We showed the court that he no longer even thought, believed that the asbestos as a diagnosis existed anymore. That's at ROA 3948. And it said a few years ago, and this was an internal record of ANCORA dated in March of 18. And they're saying a few years ago, he no longer even believed it existed. So he was biased not to find perfusion levels at 1 slash 0. 19.8, they were using a cutoff rate of greater than 20%. That was the working cutoff rate. So Dr. Durham's failure at Clinesmith audit should not have been any provocation to go forward unless you were bent on targeting him because he was high volume. They also targeted him by conducting a CFE, a certified fraud examination. You had Gary Wingo, you had Anders Molnar, and you had Bruna Patterson, three active members on the audit team that were CFEs. And they were, you look at the e-mails, you saw how they were trying to talk despairingly about Dr. Durham and so forth. They were on him trying to say he – well, they did. They said he was a nefarious player, and they were trying to plug him into this theory of a cabal of doctors, law firms, and PFTs. Mr. Pauley, you need to wrap it up, sir. Yes, ma'am. There was one comment I wanted to make that opposite counsel has said, and I don't see my note, and I apologize, and I'm out of time. You can say a final sentence, but we have your argument. Ankura claimed in their response brief that the trustees were fully informed. And I pointed out in my reply brief at pages 25 to 27, 12 bullet points of things that there's no evidence in the record that the trustees were informed about. That dovetails with my earlier argument and question from Judge Wilson as to whether or not I perceived the trustees' approval of John Brophy's recommendation as a rubber stamp. Thank you very much. We have your arguments in this case, and it is submitted. And this court will stand adjourned pursuant to the usual order.